# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FT. MYERS DIVISION

**SAMUEL ARCURE,**

     **Plaintiff,**

**-vs-**               **Case No.  2:11-cv-266-FtM-DNF**

**WILLIAM MCCABE and MARINE
TOWING & SALVAGE OF SW FL., INC.
d/b/a Tow Boat US of Lee County,**

     **Defendants.**
_____

## OPINION AND ORDER

On May 4, 2011, Arcure filed a Complaint (Doc. 1) against McCabe alleging McCabe was negligent, causing injury to Arcure.  On November 10, 2012, Arcure filed an Amended Complaint (Doc. 42) naming McCabe and Marine Towing & Salvage of SW FL., Inc. (hereinafter "Tow Boat US") as Defendants and alleging negligence against both McCabe and Tow Boat US causing injury to Arcure. On November 30, 2011, McCabe filed an Answer and Affirmative Defenses to Plaintiff's Amended Complaint and a Cross-Claim for Contribution and Indemnity against Marine Towing & Salvage of SW Fl, Inc. (Doc. 44).  On December 7, 2011, Tow Boat US filed an Answer to Amended Complaint. (Doc. 48).  On August 3, 2012, Summary Judgment was entered on the claim for Indemnity in favor of Tow Boat US.  (See, Doc. 95).   In the Cross-Claim, McCabe asserts that Tow Boat is liable to McCabe for contribution such that if McCabe is liable to Arcure, McCabe seeks contribution from Tow Boat US.

A bench trial in this action commenced on November 13, 2012 and continued through November 14, 2012.  The Court continued the trial until December 3, 2012 to allow an unavailable witness, Michael J. McCook the opportunity to testify.  The parties presented closing arguments on December 3, 2012.  After considering the evidence presented at trial, the arguments of counsel, and the applicable law, the Court issues its decision in this case.  The parties agreed to consent to proceed before a United States Magistrate Judge.  (See, Docs. 52 and 58).

## I.  Jurisdiction and Venue

Pursuant to 28 U.S.C. §1333, "[t]he district courts shall have original jurisdiction, exclusive of the courts of the State of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled," and therefore, the Court has subject matter jurisdiction over this action.  The claims at issue in this case are maritime and admiralty claims pursuant to FED. R. CIV. P. 9(h), and admiralty law applies.  The Court has *in personam* jurisdiction over the parties and venue is proper in the Fort Myers Division of the Middle District of Florida.

## II.  Summary of the Testimony

On November 13, 2009, William McCabe, Eric Rosales, Michael Mitchell, and Stuart Shearon went boating in McCabe's boat, the *Landshark*.  The *Landshark* was a 40 foot Rinker vessel weighing over 20,000 lbs. (Doc. 110[1], ¶6). They had planned on attending the power boat races in Key West, however due to the poor weather conditions McCabe changed his mind. They left Wiggins Pass at

---

[1] The Court is citing to the Amended Joint Statement of Facts which Are Admitted and Will Require No Proof at Trial (Doc. 110) filed on October 24, 2012.

approximately 11:00 a.m. McCabe knew he did not have a full tank of gas.[2]  McCabe, Mitchell and Rosales were experienced boaters.  McCabe planned on returning to Wiggins Pass low on fuel so that the *Landshark* would not hit bottom going through the Pass. They had lunch on Cabbage Key and then proceeded to return to Wiggins Pass.  Approximately 3 to 5 miles west of San Carlos Pass in the Gulf of Mexico, the *Landshark* suffered complete fuel starvation. (Doc. 110, ¶8).  The *Landshark* was equipped with lines, fenders, and a bow thruster near the front of the boat.

McCabe anchored and radioed Tow Boat US for a tow. (Doc. 110, ¶9).  McCabe was a member of Tow Boat US.  (Doc. 110, ¶4).  A tow boat from Tow Boat US arrived captained by Ed Semon. (Doc. 110, ¶10).  He was an experienced tow boat captain.  Due to the rough conditions, Capt. Semon did not pull alongside the *Landshark*.   He threw three gallons of gasoline to McCabe to pour into the fuel portal.  (Doc. 110, ¶10).  McCabe attempted to restart the *Landshark*, but to no avail. (Doc. 110, ¶10).   Another tow boat arrived captained by Sean Steinberg. (Doc. 110, ¶11).  Capt. Semon knew that Capt. Steinberg was a new employee of Tow Boat US.  Capt. Semon decided to tow the *Landshark* to the calmer waters of Big San Carlos Pass, and then pass the tow off to Capt. Steinberg so that Capt. Steinberg would get credit for the tow.  (Doc. 110, ¶¶10-11).

Capt. Semon threw a bridle to the *Landshark*, and it was attached to the *Landshark* by 2 forward cleats on the *Landshark*.  When the *Landshark* entered into Big San Carlos Pass, Capt. Semon passed the tow off to Capt. Steinberg.  The waters were calm in the channel. (Doc. 110, ¶15).  Capt. Steinberg testified he contacted Fish Tale Marina that a tow was coming that needed fuel. (Doc. 110, ¶14).  He contacted the Marina because it was close to 5:00 p.m. and he wanted to make sure the

---

[2]  There is conflicting testimony as to whether the gas tank was 1/2 full or 1/8 full at the time they left Wiggins Pass, but this matter is not material to this decision.

Marina would stay open to refuel the *Landshark,* and also to notify the Marina that a large boat was being towed into the Marina.[3]  The *Landshark* had no primary engine power.  (Doc. 10, ¶19).  It did have a bow thruster which was an electronically operated propellor located at the bow to help pivot the bow from starboard to portside depending on the desired direction.  (Doc. 110, ¶19).  The control for the bow thruster was located at the pilot's helm of the vessel.  (Doc. 110, ¶19). Capt. Steinberg is very familiar with Fish Tale Marina because he had been there with the Coastguard and with his own personal boat.

The dock was u-shaped. (Doc. 110, ¶16).  Capt. Steinberg was using a "sling straddle" method for the tow.  Capt. Steinberg aimed  his tow boat in the same path that he wanted the *Landshark* to follow, and then at the last minute immediately before going into the dock,  he turned to port, and made his tow line slack.  Capt. Steinberg believed this method would allow the *Landshark* to follow the same trajectory and coast into the u-shaped dock.

Workers at Fish Tale Marina including Alec Pica, Mark Combs, and Samuel Arcure went to the dock to assist in the docking of the *Landshark.* (Doc. 110, ¶17).  Alec Pica was standing in the u-shaped dock at Fish Tale Marina on the right side finger pier from the viewpoint of being on the water facing the fuel pumps. (Doc. 110, ¶17). Mark Combs was standing on the same side of the dock as Pica.  (Doc. 110, ¶17). Samuel Arcure was standing on the opposite side of the dock from Pica and Combs.  Arcure was standing on the left side finger pier again from the viewpoint of being on the water facing the fuel pumps.  Arcure was on the finger pier with Pylon D.

---

[3]  Mark Combs who manages Fish Tale Marina testified that he was not notified but instead saw the tow boat coming and went to assist, but this matter is not material to the decision.

Arcure has a master captain's licence for 50 gross ton vessels, a commercial license, and a marine radio operator's permit.  (Tr.[4] p. 41).  He had been fishing since he was 8 or 9 years old. (Tr. p. 41-42).  He began a fishing guide business in 2001, and got a six-pack license in 2002.  (Tr. p. 42). He is a member of the National Association of Charter Boat Operators, Florida Guides Association, the Conservancy of Southwest Florida, the Bonefish Tarpon Trust, as well as archery associations. (Tr. p. 42).  Arcure competed in fishing tournaments from 2002 through 2009.  (Tr. p. 45). He owns a boat.  (Tr. p. 45). Arcure began working at Fish Tale Marina in June 2009. He worked at the ship's store, moved rental boats, and helped with docking vessels.  (Tr. p. 47).

When nearing the dock, the *Landshark* was traveling at idle speed. McCabe had no way to steer the vessel with the exception of the bow thruster.  The *Landshark* coasted into the u-shaped dock, however, it did not travel straight into the dock but rather was heading toward Pylon D finger pier, which is to the left if facing the fuel pumps from the water.  Samuel Arcure was standing on the Pylon D[5] finger pier waiting to assist the *Landshark.* (Doc. 110, ¶20).   Mitchell moved to the bow of the *Landshark* on the starboard side to assist in the docking.  Rosales moved to the bow of *Landshark* port side to assist as well. Shearon moved to the stern of the boat port side.  Rosales had a line, and it was Mitchell's normal practice to have a line with him on the bow of a boat.  McCabe was multi-tasking, doing multiple acts to try to avoid an allision.  McCabe had fenders for the *Landshark* however they attached at the midship cleat and the aft cleat, and McCabe chose not to use them.   (Tr. p. 117). McCabe used the bow thruster.  The anchor of the *Landshark* protrudes from the bow of the boat by

---

[4]  "Tr." refers to the Trial Transcript (Doc. 130).

[5]  Pylon D was a cement structure which rose above the finger pier.

approximately 2 feet.  Arcure was standing on the finger pier near Pylon D with a telescoping pole in his left hand.

Arcure testified that right before five o'clock, he along with Combs, and Pica were told that a boat was coming in and to go help it dock.  (Tr. p. 48).  He grabbed a telescopic pole in his left hand.  (Tr. p. 48-49).  Arcure testified that the *Landshark* was coming in at a "minimal crawl, very slowly."  (Tr. p. 51).  He described the boat as "barely moving."  (Tr. p. 67).  He saw it coming in "really slowly and calmly, and then the next thing I know I was looking down and I lost track of the towline.  I had seen a towline and I didn't know where it went.  And then the next thing I know, without any warning and unexpectedly the bow of the *Landshark* came straight at me, at my head and face."  (Tr. p. 51).  Arcure described the bow as pivoting toward him suddenly, and the bow and anchor were coming straight at him.  (Tr. p. 67-68).   He had the pole in his left hand, and he had his right hand "up here" and the boat smashed his right hand against the piling.  (Tr. p. 51).  Arcure testified that he would not place himself between a boat and a concrete pylon, and he was not in danger until the boat pivoted towards him.  (Tr. p. 52). Arcure agreed that it was dangerous to place a hand between a 20,000 pound boat and a pylon.  (Tr. p. 69-70).  Arcure was not sure where his right hand was prior to the accident but testified "[i]t probably was on the anchor at some point."  (Tr. p. 70).  He testified he was not actively grabbing the boat, the boat came at him and he reacted.  (Tr. p. 71).

### III.  Uncontroverted Facts

The accident occurred in a matter of a few seconds and the testimony varied as to what actually happened. The uncontroverted facts are that the *Landshark* was coasting towards the dock but heading towards Pylon D rather than the back of the dock where the fuel pumps were located.  The anchor of

the *Landshark* was heading directly toward Pylon D. At some point in time, Combs yelled to Arcure

to watch out for his hand. Arcure's right hand was between the anchor of the *Landshark* and Pylon D

when the *Landshark* allided with Pylon D.  A part of Arcure's right dominant hand was crushed

causing extensive and permanent injuries to Arcure's right hand and pinkie finger.  (Doc. 110, ¶20).

Arcure had several surgeries as a result.  The *Landshark* successfully docked at Fish Tale Marina, and

sustained no damage.  Eventually it was refueled and McCabe, Mitchell, Shearon, and Rosales returned

to Wiggins Pass.  None of the individuals on the *Landshark* felt an impact or jolt or lost their balance

at any time, including when the allision occurred.

### IV.  Testimony of Experts

Captain Mitchell Stoller testified as an expert for Arcure in the areas of maritime safety,

navigation, and risk assessment as it related to a vessel's operation. (Tr. p. 133).  Capt. Stoller testified

that McCabe, as the captain of his vessel, had the responsibility to handle the vessel safely as to the

vessel itself and the people involved.  (Tr. p. 135).  Capt. Stoller opined that McCabe should have had

someone throw a bow line to Arcure as the *Landshark* was docking. (Tr. P. 137).  By throwing a bow

line, Capt. Stoller testified that Arcure may  have grabbed it or not, but would have used the pole in

his hand and began walking towards land.  Capt. Stoller opined that Arcure's hand would not have

been near the pylon if a line were thrown.  (Tr. p. 149).

Capt. Stoller testified that the *Landshark* was equipped with fenders and fenders absorb shock.

(Tr. p. 139).  Capt. Stoller asserted that fenders should have been used to lessen the impact, but agreed

fenders would not have prevented the allision.  (Tr. p. 150).  Capt. Stoller did not believe that the bow

thruster caused the allision.  (Tr. p. 151).

Capt. Stoller testified that McCabe failed to adequately communicate with Capt. Steinberg before and during the docking.  Capt. Stoller opined that any sudden pivot by the *Landshark* was more likely than not caused by the tow line catching on the dock.  (Tr. p. 146).

Capt. Stoller opined that the sling or straddle method was not necessary because there were a total of seven people to dock the vessel. (Tr. p. 140).  His opinion was that Capt. Steinberg more likely than not failed in his nondelegable responsibility to tow the *Landshark* to dock with due care  and mishandled the tow.  (Tr. p. 147-148).

Robert Miller testified as an expert for McCabe in the fields of dynamic analysis, accident reconstruction, human factors, marine and mechanical engineering.  (Tr. p. 240).  Mr. Miller testified that Arcure indicated in his deposition testimony that, "it's common sense that you don't get between a boat and a stationary object."  (Tr. p. 253).  Mr. Miller testified that Arcure placed his hand in a position where it became caught between the anchor and the piling and Arcure was the only one who could have prevented his hand from being placed there.  (Tr. p. 253).  Mr. Miller testified that as an experienced captain, Arcure admitted that he knew better than to place his hand between a vessel and a stationary object.  (Tr. p. 254).

Based upon tests performed by Mr. Miller on the *Landshark* after the accident, he opined that the bow thruster was not capable of causing the *Landshark* to make a sudden movement to port that would have resulted in an allusion between the *Landshark* and Pylon D.  (Tr. p. 255).  Mr. Miller testified that it would have been dangerous for a crew member to lean over the bow rail and out the length of the anchor to place a fender on the bow of the boat, and it would not have prevented the allision.  (Tr. p. 256-5).

Michael McCook testified as an expert for Tow Boat US in vessel operations, rules of the road, and towing.  He opined that it was impossible for the tow line or bridle to snag on the finger pier at Fish Tale Marina based upon the position of the Tow Boat and the pier.  Further, no one on the *Landshark* testified as to feeling a sudden impact or jolt and Capt. Steinberg never felt any sudden jolt either.  Mr. McCook testified that Capt. Steinberg followed all protocol when towing the *Landshark.*

### V.  Findings of Fact

Arcure was standing on the left side finger pier at Fish Tale Marina from the viewpoint of being on the water facing the fuel pumps.  The *Landshark* was coasting into the dock at a minimal speed, very slowly.  McCabe had no mechanism to steer the *Landshark* other than using the bow thruster.  The *Landshark* was headed toward Pylon D.  Mitchell, Rosales and Shearon were on the *Landshark* in various locations.  McCabe was doing many tasks, but when he saw that the *Landshark* was going to allide with Pylon D, he turned on the bow thrusters.  Combs yelled to Arcure to watch out for his hand.  Arcure placed his right hand on the anchor of the *Landshark*, and the anchor of the *Landshark* glanced off of Pylon D, injuring Arcure's right hand. No one on the *Landshark* felt an impact or jolt nor did they lose their balance.  The *Landshark* docked successfully and  sustained no damage from the incident.

### VI.  Conclusions of Law

Admiralty law adopts general tort law including general principles of negligence law, as long as it is not inconsistent with the law of admiralty.  *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1336

(11th Cir. 2012) (citing *Daigle v. Point Landing, Inc.*, 616 F.2d 825, 827 (5th Cir. 1980)).  "To plead negligence, a plaintiff must allege that (1) the defendant had a duty to protect the plaintiff from a particular injury; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff suffered actual harm." *Id.* (citing *Zivojinovich v. Barner*, 525 F.3d 1059, 1067 (11th Cir. 2008)).  The plaintiff must establish that the defendant owed him a duty under the law to conform to a particular standard of conduct to avoid harm to others, that the defendant breached such duty, and that the breach harmed the plaintiff.  *Hoefling, Jr. v. City of Miami*, 2012 WL 2872762, *9 (S.D. Fla. July 13, 2012).  If two or more parties have contributed to the fault that caused the damage in a maritime collision, then the damages are allocated among the parties proportionately to the comparative degree of their fault.  *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 411 (1975) and *Fischer v. SY Neraida*, 508 F.3d at 593 ("Liability in collision and allision cases has always been apportioned based on fault.").  When the moving vessel is under the control of a compulsory pilot such as a tug boat captain, then the owner of the vessel may escape liability only when the pilot of the tug was actually in charge of the vessel and solely at fault.  *Mount Washington Tanker Co. v. Wahyuen Shipping, Inc.*, 833 F.2d 1541, 1542 (11th Cir. 1987).

The Court sympathizes with the injury that Arcure suffered and the repercussions from his injury, however, Arcure failed to prove that McCabe and Tow Boat US were negligent in this case. The first element that Arcure must prove is that McCabe or Tow Boat US or both of them had a duty to protect Arcure from the injury he suffered. The Court determines that McCabe and Tow Boat did not have a duty to protect Arcure from the injury he suffered.  While McCabe and Tow Boat US had a duty to avoid harm to others, their duty did not extend to a person who placed a part of his body

-10-

between a vessel under tow or coasting and an inanimate object. McCabe and Tow Boat US in docking the *Landshark* at Fish Tale Marina acted reasonably and did not breach any duty to Arcure.

The Court reviewed the testimony from Arcure's expert Capt. Stoller regarding the actions of McCabe and Tow Boat US. In reviewing the evidence, the Court determines that the *Landshark* was proceeding into the Fish Tale Marina fueling dock at minimal speed. Although there was some testimony that the *Landshark* was coming into the dock at excessive speed, the majority of witnesses (including Arcure who testified that the *Landshark* was coming into the dock at a minimal crawl) agreed the speed was appropriate. (Tr. p. 51). Another indication that the speed of the *Landshark* was appropriate was that it sustained no damage even though it allided with or glanced off of Pylon D.

The duty of both McCabe and Tow Boat US was to safely dock the *Landshark*, and they were successful in docking the vessel. The *Landshark* sustained no damage. Capt. Stoller testified that McCabe or his passengers should have thrown lines, and if someone would have thrown a line to Arcure, he would not have been in the position to have his hand between the *Landshark* and Pylon D. This testimony is purely speculation. No one knows what would have happened if a line was thrown. Further, Capt. Stoller indicated that McCabe should have put the fenders on the *Landshark*, however, there was no testimony that the use of the fenders would have prevented the allision, only that their use may have lessened the impact. Mr. Miller testified that it would have been dangerous for a crew member to place a fender over the bow rail and the anchor on the bow of the boat. The Court finds that McCabe acted reasonably regarding the lines and fenders.

Capt. Stoller also testified that McCabe and Capt. Steinberg should have been in better communication so that the vessel would not have allided with Pylon D. McCabe and Capt.

Steinberg were in sufficient communications so that McCabe knew where the *Landshark* was being towed.  McCabe believed that the boat was going to allide with Pylon D and used his bow thruster (according to his testimony) to attempt to avoid the allision.  The allision between the *Landshark* and Pylon D was not of such impact that it impacted or jolted any of the passengers on the vessel or caused them to lose balance.  In fact, no one testified they "felt" the allision at all.  Arcure testified that the bow of the boat suddenly swung towards him, however, the *Landshark* was not moving at sufficient speed to move "suddenly" nor would the bow thrusters have caused the vessel to move "suddenly" and Arcure was experienced enough to know that McCabe had little or no control over the vessel.

Capt. Stoller asserted that the sling straddle method was not necessary to dock the boat because there were seven people available to dock the vessel. Capt. Stoller did not explain why this method was unreasonable or negligent.  Capt. Steinberg docked the *Landshark* successfully using this method, with no damage to the *Landshark*.

Capt. Stoller testified that the tow line may have snagged or caught on something which caused the *Landshark* to pivot into Pylon D.  If this snag did occur, then it was not of such force to cause any of the passengers on the *Landshark* to feel a jolt or to lose their balance.  Again, the *Landshark* was moving slowly at or below idle speed, and none of the passengers on the boat felt anything.  There was testimony that the *Landshark* glanced against Pylon D which appears to be the case.

The Court carefully examined the testimony of the witnesses which was conflicting at times, however, it was clear the Arcure placed his hand somewhere on or near the *Landshark* and between some part of the *Landshark* and Pylon D.  There was no testimony from any witness or

-12-

expert that this action was reasonable.  Arcure was experienced with vessels.  He was a fishing

guide.  He was employed to work at Fish Tale Marina.  One of his duties was to assist in docking

vessels.  Arcure knew or should have known based on his experience, that the *Landshark* was

under tow, had no steering capabilities, was a large vessel, and that the captain of the *Landshark*

and the tow boat operator had little if any control over the course of the *Landshark*.  Because the

*Landshark* had very little if any functioning navigational devices, Arcure should have known that

its course was not assured, and that sudden pivots could occur for many reasons, including a line

snagging or a bow thruster being used. McCabe testified that he used the bow thruster to move

away from the finger pier, however, Arcure's theory is that the use of the bow thruster actually

moved the *Landshark* toward Pylon D.  Mr. Miller's testimony was uncontroverted that the use of

the bow thruster was not capable of causing the *Landshark* to make a sudden movement to port

which would have resulted in the allision.  After reviewing all of the testimony and evidence, the

Court  finds that neither McCabe nor Tow Boat US had a duty to protect Arcure from placing any

part of his body between a vessel under tow or coasting and an inanimate object such as Pylon D.

Arcure knew the danger of placing any part of his body between a vessel and an inanimate object.

Arcure did not act reasonably in placing his hand between the *Landshark* and Pylon D.

McCabe and Tow Boat US had no duty to protect Arcure from acting in an unreasonable manner by

placing his hand between the *Landshark* and Pylon D.  Although there was testimony that McCabe

and Tow Boat US could have acted differently in some respects, the Court finds that McCabe and

Tow Boat US were not negligent in their actions in docking the *Landshark*, and that neither

McCabe nor Tow Boat US had a duty to protect Arcure from the particular injury he suffered.

-13-

Therefore, the Court finds for McCabe and Tow Boat US on the Amended Complaint, and finds that Counterclaim for Contribution to be moot.

**IT IS HEREBY ORDERED:**

1)  McCabe's Oral Motion and Renewed Oral Motion on Partial Findings pursuant to FED. R. CIV. P. 52(c) is **DENIED**.

2) Tow Boat US's Oral Motion on Partial Findings pursuant to  FED. R. CIV. P. 52(c) is **DENIED**.

3) Judgment on the Amended Complaint (Doc. 42) shall be entered in favor of the Defendants, William McCabe and Marine Towing & Salvage of SW FL, Inc. d/b/a Tow Boat US of Lee County and against the Plaintiff, Samuel Arcure.

4) Judgment on the Counterclaim (Doc. 44) by William McCabe against Marine Towing & Salvage of SW FL, Inc. d/b/a Tow Boat US of Lee County shall be entered finding the Counterclaim moot.

5) The Clerk is further directed to terminate all deadlines and to close the file.

**DONE** and **ORDERED** in Chambers in Ft. Myers, Florida this __11th__ day of January, 2013.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record

-14-